**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TONY WILKINS,**

      **Plaintiff,**

**v.**                         **Case No.: 1:18-cv-00943**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 11). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be

1

**AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On October 22, 2014, Plaintiff, Tony Wilkins ("Claimant"), completed an application for DIB alleging a disability onset date of December 23, 2013 due to "back injury, right hip pain, right leg pain, burning and stinging down back of right leg, and right foot and leg are numb and stinging." (Tr. at 203, 226). Claimant submitted an application for SSI on November 4, 2014. (Tr. at 205). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 154-56, 162-64). Claimant filed a request for an administrative hearing on April 22, 2015. (Tr. at 168). The administrative hearing was held on May 5, 2017, before the Honorable Richard Zack, Administrative Law Judge ("ALJ"). (Tr. at 34-51). By written decision dated May 30, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 21-29). The ALJ's decision became the final decision of the Commissioner on March 22, 2018, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant filed a Brief in Support of Complaint and Motion for Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 7, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 41 years old on his amended disability onset date and 45 years old on the date of the ALJ's decision. (Tr. at 111). Claimant, who communicates in English,

graduated from high school in 1990. (Tr. at 225, 227). He received specialized training in automobile mechanics while attending high school. (Tr. at 227). Claimant previously worked as an automobile technician for over 20 years, with a brief stint as a hardware installer. (Tr. at 224).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

In the present case, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 24, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 23, 2013, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease and obesity." (Tr. at 24-25, Finding No. 3). The ALJ also considered Claimant's diagnosis of anxiety, but found the condition to be non-severe. (*Id.* at 24-25).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the

4

impairments contained in the Listing. (Tr. at 26, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift and/or carry up to 20 ponds [sic] occasionally and 10 pounds frequently. He can sit, stand, and/or walk for six hours out of an eight-hour workday. He must avoid hazards, such as ladders and scaffolds, unprotected, dangerous heights, and unprotected machinery; excessive vibration; temperature extremes; and heavy concentrations of dust, fumes, and gases. He can use his upper extremities/hands for reaching, fingering, and feeling on a continuous basis. He can frequently interact with others.

(Tr. at 26-28, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 28, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education, in combination with his RFC, to determine his ability to engage in substantial gainful activity. (*Id.*, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 28, Finding Nos. 7-9). Given these factors and Claimant's RFC, and with the assistance of a Vocational Expert ("VE"), the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 28-29, Finding No. 10). The ALJ determined that despite Claimant's additional limitations, which eroded the light unskilled occupational base, he was still capable of performing the job duties of representative occupations such as non-checking cashier, ticket taker, and vending machine attendant. (Tr. at 29). Accordingly, the ALJ found that Claimant was not disabled under the Social Security Act. (*Id.,* Finding No. 11).

## IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises four challenges to the validity of the ALJ's decision. First, he argues that the ALJ's determination that Claimant's impairments did not meet a listing is not supported by substantial evidence. (ECF No. 7 at 6). Claimant believes that the record established that his impairments met Listing 1.04A—the regulation identifying disorders of the spine—and the ALJ's decision to the contrary was in error. *Id.* The Commissioner disagrees with Claimant's contention that he met all of the listing's requirements and asserts that the ALJ properly determined Claimant did not provide evidence of nerve root compression, motor loss, or positive straight-leg raising, as required by the listing. (ECF No. 11 at 7).

Claimant's second argument is that the ALJ erred in refusing to consider opinion letters from Claimant's treating physician, which were submitted within five days of the hearing. (ECF No. 7 at 8). Claimant states that the opinions were "a very important piece of evidence," because, if given controlling weight, they would have conclusively established that Claimant was physically unable to work. (*Id.*). Claimant argues that the ALJ had a duty to consider the opinion evidence as Claimant clearly met an exception to the general rule requiring all evidence to be submitted five days prior to the hearing. (*Id.* at 11). Claimant asserts that the ALJ's decision to ignore the opinions, despite Claimant's ability to establish an exception, constituted "clear error" and requires a reversal of the decision. (*Id.* at 13). In response, the Commissioner contends that the ALJ properly determined that the fact Claimant had been successfully obtaining records from his treating physician, during the same time that Claimant was allegedly unable to obtain the late-tendered opinion evidence, undermined his assertion that he was unable to submit the opinion evidence in a timely fashion. (ECF No. 11 at 11).

6

Claimant's third basis for reversal is that the ALJ's decision is not supported by substantial evidence. (ECF No. 7 at 13). Claimant argues that the ALJ failed to "provide rationale or reason" in concluding that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.* at 13). Claimant faults the ALJ's reliance on Claimant's reported daily activities, arguing that the ALJ failed to consider the additional details regarding those reported activities provided by Claimant's testimony at the hearing. (*Id.* at 17).

Finally, Claimant argues that the ALJ erred in assessing Claimant's credibility as the ALJ's opinion is "devoid of any true analysis of the factors required to assess credibility." (*Id.* at 20). According to Claimant, the ALJ's opinion largely consists of "boilerplate language" and fails to adequately weigh Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms against the medical record. (*Id.* at 20-22). The Commissioner treats Claimant's third and fourth claims as essentially raising one argument—that the ALJ's decision was not supported by substantial evidence—and argues that the ALJ appropriately assessed the record and reached a decision that was supported by substantial evidence. (ECF No. 11 at 12, 15).

## V.   **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

On April 4, 2013, Claimant underwent surgery on his right shoulder to repair a rotator cuff, damaged after a fall at work on March 21, 2013. (TR. at 307). Claimant participated in a physical therapy program at Greenbrier Valley Physical Therapy until July 2013. (Tr. at 296-305, 308). On October 31, 2013, Claimant visited Charles McClung,

D.O., with reports of knee and back pain and seeking medication refills. (Tr. at 383). Claimant was at the time on a medication regimen consisting of Lisinopril and Naprosyn. (*Id.*). On examination, Claimant's lumbosacral spine displayed decreased lordosis and left paraspinal spasms; his sacral promontory exhibited tenderness on palpation; and a compression test was positive at both sides of the sacroiliac joint. (Tr. at 385). The examination also revealed restricted rotation of Claimant's right hip and tenderness on palpitation of both hips. (*Id.*). Claimant's gait and stance were normal. (Tr. at 386).  Dr. McClung diagnosed Claimant with sacroiliitis; lumbago; and somatic dysfunction of several anatomical regions, including the rib cage, thoracic region, lumbar region, sacrum, pelvic region, and lower extremities. (Tr. at 386). Dr. McClung rendered osteopathic manipulative treatment ("OMT") to the affected areas and continued Claimant on Lisinopril for hypertension and Naprosyn for generalized pain. (Tr. at 386-87).

On December 23, 2013, Claimant reported to Greenbrier Valley Medical Center's emergency room with complaints of right hip pain. (Tr. at 311). Claimant was at work and experienced excruciating pain after bending down and attempting to stand back up. (*Id.*). Claimant reported decreased range of motion, pain, and possible dislocation. (*Id.*). A CT scan of his lumbar spine and x-rays of his lumbosacral spine, pelvis, and right hip were taken. (Tr. at 314-17, 381-82, 392). David Maki, D.O., reviewed the films and saw no evidence of fracture or dislocation, but did find mild anterior subluxation of L5 on S1. (*Id.*). Dr. Maki's impression was of "chronic appearing changes" for which he recommended a follow-up MRI. (Tr. at 381.). The emergency room staff documented that the films showed degenerative joint disease, degenerative disc disease, but no fractures. (Tr. at 312). Claimant was discharged the same day after receiving Dilaudid, Flexeril, and

Solumedrol. He was instructed to use ice, rest, and take his prescriptions of Naproxen, Effexor, and Lortab. (Tr. at 312).

Claimant returned to the emergency department later that day by ambulance, complaining of continuing pain. (Tr. at 322). A physical examination revealed painful range of motion on flexion, muscle spasms, positive straight leg raise, and normal deep tendon reflexes. (Tr. at 323). Claimant's motor strength and movement were normal, and his muscle tone and sensation were intact. Claimant and his family informed the staff that if Claimant were discharged again he would merely return later that evening, so medical staff decided to place Claimant in observation. (*Id.*).

While on observation, Claimant's care was assigned to Jeremy Proctor, D.O., who also examined Claimant. (Tr. at 327-30). Claimant advised Dr. Proctor that the pain was severe and was located in the right side of his back, right buttock, and right lateral posterior leg. (Tr. at 327-28). Other than some numbness in his right big toe, Claimant had no neurological complaints and no complaints of decreased range of motion, limping, gait abnormalities, or difficulties with balance. Dr. Proctor found tenderness in Claimant's right paraspinal muscle and over his right buttock, and a straight leg raise was positive on the right side. (Tr. at 329). Claimant was diagnosed with acute low back strain and sprain, lumbar radiculopathy, and hypertension. He was discharged on December 25, 2013 after reporting improvement in his condition. (Tr. at 325-26). Claimant's condition was noted as stable. He was instructed to resume normal activity as tolerated and to follow up with Dr. McClung. Claimant was prescribed Methocarbamol, Prednisone, Gabapentin, and Norco at discharge. (*Id.* at 326).

Claimant was seen by Dr. McClung on December 27, 2013. (Tr. at 438). Claimant reported continuing back pain, with the pain "shooting down" his right leg to the toes.

(*Id.*).  A physical examination revealed tenderness midline to right L5 transverse process, as well as a limitation of passive motion in the lumbar spine. (Tr. at 440). Claimant's gait and station were abnormal with limping observed. (*Id.*). Claimant's deep tendon reflexes were abnormal with straight-leg raising to 45 degrees. (*Id.*). Claimant was prescribed hydrocodone-acetaminophen, and Dr. McClung indicated the need for intensive physical therapy. (*Id.*).

Claimant was given an MRI examination on January 6, 2014. (Tr. at 388). The examination revealed "relatively mild disc degenerative changes throughout the lumbar spine, greatest at L4-5" as well as "mild facet degenerative changes throughout the lumbar spine." (*Id.*). There was "minimal disc bulging at L3-4 with minimal encroachment upon the canal and left neural foramen." (*Id.*). The reviewing physician, Robert O'Brien, M.D., discovered minimal disc bulging at L5-S1, resulting in minimal encroachment upon the canal and mild to moderate foraminal encroachment. (*Id.*). Dr. O'Brien believed that the disc bulging did "appear to abut or mildly displace but not compress the exiting nerve root at that level." (Tr. at 389).

On January 9, 2014, Claimant was seen by Dr. McClung. (Tr. at 434). Claimant's physical examination revealed results similar to his examination on December 27, 2013. (Tr. at 436). Dr. McClung advised Claimant to rest and continue taking his pain medications, and referred Claimant to a neurosurgeon. (*Id.*). Claimant returned on January 16, 2014, and reported that his right leg pain had worsened while taking Neurontin, so he had stopped taking it. (Tr. at 430). Claimant was experiencing pain, tenderness and numbness in his toes, and weakness in his right knee. (*Id.*). The results of Claimant's physical examination remained the same. (Tr. at 432). Dr. McClung diagnosed Claimant with lumbosacral radiculopathy, initiated a plan for physical therapy treatment,

10

and referred Claimant to a neurosurgeon. (*Id.*).

Claimant continued reporting back and leg pain at his January 30, 2014 visit to Dr. McClung. (Tr. at 427). Claimant's physical examination results remained unchanged. (Tr. at 429). Claimant attended physical therapy sessions at Greenbrier Valley Physical Therapy from January 22, 2014 to February 28, 2014. (Tr. at 341-79). While attending physical therapy, Claimant reported varying levels of pain, although his rehabilitation potential was consistently rated as "good." (Tr. at 353, 355, 357, 359, 361, 363, 365, 367, 369, 371, 375). Claimant's worker's compensation claim was denied during this time. (Tr. at 353).

On February 27, 2014, Claimant returned to Dr. McClung's office for a follow-up appointment and to obtain a "work excuse." (Tr. at 424). Claimant's strength and coordination were improving in his right leg, "with minimal persistent weakness in dorsiflexion right foot." (*Id.*). Claimant's physical examination revealed findings similar to those at earlier visits, except that Claimant reported "significantly less pain radiation than in current weeks." (Tr. at 426). Claimant informed Dr. McClung he had met with the neurosurgeon consultant. The neurosurgeon told Claimant that his back-pain issue was "non-surgical" and "that eventually it would improve some." (*Id.*).

Claimant was next seen by Dr. McClung on March 31, 2014. (Tr. at 421). Claimant reported that he was still experiencing back pain and that his back would "tighten up" after walking on a concrete floor for fifteen minutes. (*Id.*). Claimant's physical examination reflected little change, with the exception that his right foot now showed weakness and dorsiflexion, when both seated and standing. (Tr. at 423).

On April 25, 2014, Claimant reported that the toes on his right foot felt numb, but were extremely sensitive to pain. (Tr. at 417). Claimant's musculoskeletal examination

revealed similar findings as were found in previous examinations, with the addition of spasms of the right quadratus lumborum musculature, with scattered trigger points in the muscle. (Tr. at 419). Claimant still displayed an abnormal gait and stance with limping, with the addition of a positive foot slap with heel strike when attempting a normal gait over an even surface. (*Id.*). An examination of Claimant's reflexes were abnormal result, and he had positive straight-leg raising at 45 degrees. Claimant displayed hyperesthesia along the L4 dermatome medial right ankle and foot, persistent weakness of the right foot with dorsiflexion, and increased patellar reflex on the right with an accompanying decreasing girth of the right calf muscles as compared to the left. (*Id.*). Dr. McClung noted a "significant decline in right lower extremity function" since the prior visit. (*Id.*). Dr. McClung diagnosed Claimant with sciatic nerve palsy on the right and noted a concern "that the nerve injury has persisted long enough that [Claimant] may be developing early causalgia." (*Id.*). Dr. McClung prescribed Claimant Methocarbamol and Naprosyn, as well as continuing Claimant's hydrocodone-acetaminophen prescription. (Tr. at 420). Dr. McClung believed that Claimant should receive "immediate attention by physiatrist and neurosurgeon." (*Id.*).

Claimant reported continuing back and leg pain at his next visit with Dr. McClung on May 29, 2014. (Tr. at 413). Claimant's physical examination revealed identical results as those at the prior examination. (Tr. at 415). On June 26, 2014, Claimant stated that he was doing his home exercises and feeling stronger in his leg, but still experiencing pain and numbness of the foot. (Tr. at 409). Claimant reported difficulty driving his truck for lengthy periods. (*Id.*). Claimant's physical examination results remained unchanged except he displayed stabilization of the right leg muscle tone. (Tr. at 411). Dr. McClung believed Claimant should remain off work until July. (Tr. at 412).

12

Claimant reported little change in his July, August, and September visits with Dr. McClung and the results of his physical examinations remained essentially the same. (Tr. at 397, 399, 401, 403, 405, 407). Claimant sought a work excuse during these visits, and Dr. McClung recommended Claimant be continued off work for six months, with monthly check-ins. (Tr. at 397, 401, 404).

On October 24, 2014, Claimant reported that he was still experiencing weakness and numbness in the right foot, although on some days the pain was milder. (Tr. at 393). Dr. McClung's physical examination on this visit revealed restricted abduction and external rotation of the right hip as well as tenderness on palpitation of the trochanteric bursa and the piriformis muscle. (Tr. at 395). Claimant's ankle was inverted to the right and he had posterior right fibular head tenderness with reproduction of distal neurologic symptoms upon palpitation of fibular head. (*Id.*). Claimant's physical examination results were otherwise identical to prior examinations except that he no longer exhibited positive findings on straight-leg raising, and displayed improving girth of the right calf muscle. (*Id.*). Dr. McClung recommended OMT therapy and advised Claimant to start stretching exercises for the right hip and knee. (Tr. at 396).

During his November 24, 2014 visit, Claimant told Dr McClung that he had seen marked improvement following the OMT, although he was still experiencing pain and tingling on the top of his right foot and right toe. (Tr. at 450). The results of Claimant's physical examination were similar to that of his previous visit. (Tr. at 452). Claimant returned on December 22, 2014 and reported little change in his symptoms, saying he had "learned to just deal with it." (Tr. at 457). Claimant's physical examination returned unchanged results except that Dr. McClung noted Claimant displayed "poor effort in heel-toe walk." (Tr. at 459). Claimant demonstrated an improved range of motion and noted a

13

significant reduction in pain following OMT performed by Dr. McClung during the visit. (Tr. at 460).

On January 22, 2015, Claimant told Dr. McClung he was still struggling with weakness and tingling in his right foot and had pain after walking on concrete floors. (Tr. at 461). Claimant's physical examination revealed no significant changes. (Tr. at 463). Claimant reported little change during his February 24, 2015 check-in, and the results of his physical examination remained unchanged. (Tr. at 544, 546). On a March 24, 2015 visit, Claimant reported that his right leg was getting weaker and he was experiencing more pain; however, his physical examination did not reveal any change. (Tr. at 540, 542). Claimant did not report, nor did his physical examinations reveal, any significant change from April through September 2015. (Tr. at 520, 522-23, 524, 526, 528, 530-32, 534, 536, 538).

On October 13, 2015, Claimant told Dr. McClung that he had recently undergone a disability examination and had been experiencing increased pain in his knee since the examination. (Tr. at 516). Claimant revealed that he was very frustrated due to his continuing medical issues. (*Id.*). Claimant's physical examination results were largely the same as previous examinations, except Dr. McClung observed decreasing girth of the right calf muscles compared to the left and improving patellar reflex on the right. (Tr. at 518). Dr. McClung indicated that he found "[n]o significant change in the baseline physical and structural exam for this patient's now chronic condition." (*Id.*). Dr. McClung noted that he completed an "'Ability to do work-related activities' form" at the request of Claimant's counsel, Gregory Prudich. (Tr. at 519).

On November 9, 2015, Claimant reported experiencing a sore throat and congestion, but no significant change in his back and leg pain. (Tr. at 512). Claimant's

physical examination results likewise remained unchanged except that Claimant's right calf muscles were again improving relative to his left calf muscles. (Tr. at 514). On December 23, 2015, Claimant's physical examination was largely unchanged with the exception that the "reflex" section was no longer included in the report, and the gait and stance examination revealed continued limping, but no finding of a positive foot slap while walking. (Tr. at 506). On January 5, 2016, Claimant informed Dr. McClung he was still experiencing lower back pain as well as weakness in his right leg. (Tr. at 500). Claimant's physical examination revealed findings similar to his December 2015 examination. (Tr. at 502).

On September 9, 2016, Claimant underwent a motor nerve conduction study and electromyography ("EMG") at Greenbrier Physical Medicine and Rehabilitation. (Tr. at 484-85). The reviewing physician, Alexis Tracy, D.O., concluded that there was "evidence of mild tibial motor neuropathy in the right lower limb." (Tr. at 485). However, the study was "otherwise normal," and there was "no electrodiagnostic evidence of lumbar radiculopathy or lumbosacral plexopathy in [the] right lower limb." (*Id.*).

### B. Evaluations and Opinions

#### 1. Evaluations and opinions considered by the ALJ

On February 13, 2015, state agency physician Pedro Lo, M.D., completed a Physical Residual Functional Capacity Assessment ("PRFC") at the request of the SSA. (Tr. at 116-18). Dr. Lo first determined that one or more of Claimant's medically determinable impairments could reasonably be expected to produce Claimant's symptoms. However, Dr. Lo did not believe that Claimant's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence, and thus rated Claimant's statements about functional activities as only

"partially credible." (Tr. at 115-16).

Dr. Lo determined that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had unlimited ability to push and pull up to the weight limits Claimant could lift and carry. (Tr. at 116-17). Dr. Lo felt that Claimant had some postural limitations in that he could only occasionally climb ramps and stairs, never ladders, ropes, and scaffolds; and could only occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*). Dr. Lo did not feel that Claimant had any manipulative, visual, or communicative limitations, but thought he should avoid concentrated exposure to extreme heat and cold, as well as hazards. (Tr. at 117-18).

Hedy Mountbatten-Windsor, M.D., completed a second PRFC on March 26, 2015 for Claimant's disability determination at the reconsideration level. (Tr. at 137-39). Dr. Mountbatten-Windsor agreed with Dr. Lo's assessment that Claimant could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and walk and sit for about six hours in an eight-hour workday. (Tr. at 137-38). Dr. Mountbatten-Windsor additionally concurred with Dr. Lo's assessment of Claimant's postural limitations. She found that Claimant did not display any manipulative, visual, or communicative limitations, and agreed with Dr. Lo's findings that Claimant did have environmental limitations in that he should avoid concentrated exposure to extreme cold and heat, as well as hazards. (Tr. at 138-39). Dr. Mountbatten-Windsor thought Claimant could handle unlimited exposure to fumes, odors, dust, gases, poor ventilations, and noises. (Tr. at 139).

### 2. Evaluations and opinions not considered by the ALJ

On May 3, 2017 Claimant submitted a Medical Opinion Regarding: Ability to do

Work-Related Activities (Physical) which was completed by Dr. McClung on October 20, 2015. (Tr. at 104). Dr. McClung opined that Claimant was capable of standing for less than two hours during an eight-hour workday, and only capable of sitting, even with frequent breaks, for less than two hours during an eight-hour workday. (Tr. at 105). He felt that Claimant would need to be able to shift at will from standing, sitting, and walking, and would need to lie down at unpredictable intervals throughout the work week. (Tr. at 106). Dr. McClung indicated that Claimant's impairments would cause him to be absent from work more than three times a week. (Tr. at 107). Dr. McClung stated that Claimant "is unable to work at any gainful employment." (*Id.*).

On May 4, 2017, Claimant submitted a second Medical Opinion Regarding Ability to do Work-Related Activities (Physical), completed by Dr. McClung on May 2, 2017. (Tr. at 55). On the cover letter of the submission, Claimant's counsel stated he had "made numerous attempts to obtain medical records from [Dr.] McClung." (Tr. at 54). Counsel further relayed that he "just found out today" that Dr. McClung was behind on signing his treatment notes and that, consequently, the notes would not be ready in time for Claimant's hearing. (*Id.*).

Dr. McClung's May opinion reflected largely similar findings regarding Claimant's abilities as those contained in the October 2015 opinion. (Tr. at 56-58). Dr. McClung did not directly opine in this document that Claimant was entirely unable to find gainful employment, but did indicate that Claimant retained significant physical limitations and was "unable to crawl, kneel, balance on right leg due to impairment." (Tr. at 58). Dr. McClung believed that the weakness in Claimant's right leg produced a "trip/fall risk" and that "reaching overhead and pushing/pulling produces low back pain that radiates to right leg." (*Id.*).

### C. Claimant's Statements

On October 30, 2014, Claimant completed an Adult Function Report. (Tr. at 249-56). In the report, Claimant stated that he was unable to be on hard surfaces such as concrete or pavement for "any length of time," and was unable to stand or walk around on other surfaces for "any lengthy times." (Tr. at 249). Claimant described his daily activities as consisting of taking a hot shower every morning to ease his stiffness and aching muscles, and then watching television, reading the newspaper, walking outside, doing laundry, and taking his pain medications. (Tr. at 250). Claimant indicated that he was capable of preparing his own food daily, sweeping the floor, doing laundry and the dishes, mowing the lawn for approximately two hours every two weeks, and shopping for food or other necessities as needed. (Tr. at 251-52). Under hobbies and interests, Claimant stated that he worked on vehicles and enjoyed the outdoors, going hunting, fishing, or hiking once a week. (Tr. at 253). When asked how his enjoyment of these activities had changed following his injury, Claimant stated, "[c]an't climb or go up [and] down rugged tarrian [sic]."

Claimant testified at his administrative hearing on May 5, 2017 that he was no longer working. (Tr. at 40). Claimant told the ALJ that he lived alone and paid his bills through a combination of governmental assistance and help from his parents. (Tr. at 41). Claimant testified that he was taking pain medications, but the medications just "eased" the pain, rather than eliminating it. (*Id.*). Claimant stated that he needed to use a heating pad to loosen his muscles in the morning and two to three times throughout the day. (Tr. at 41-42). Claimant asserted that he was unable to drive for long distances, and while he was able to do his own shopping, he had to do so quickly as he was unable to stand on the concrete floor for extended periods of time. (Tr. at 42).

18

Claimant testified that he participated in outside activities, including taking walks and "fool[ing] with a garden," although his gardening activities were limited by his impairments. (Tr. at 43). The ALJ asked the Claimant if he did any hunting and fishing and Claimant replied "Yes. I love to hunt and fish." (*Id.*). Claimant asserted that he did not do so regularly, but had recently been fishing as it was trout season and had "caught a couple." (*Id.*). Claimant further testified that he would drive about a half-hour to see his parents and would occasionally go out to eat with his girlfriend. (Tr. at 43-44). Claimant affirmed that he was able to work on his vehicle, but estimated that due to his injury, an fifteen-minute oil change now took him an hour to complete. (Tr. at 44). Claimant asserted that he was only able to walk for fifteen minutes at a time and could stand for no more than one and a half to two hours out of a full day. (Tr. at 44-45). Claimant added that he needed to move continuously every fifteen minutes or so to stave off pain. (Tr. at 45).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart,

434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

Claimant's challenges to the Commissioner's decision can be divided into three categories. First, Claimant challenges the ALJ's decision to reject the late-submitted opinions of Dr. McClung. Second, Claimant challenges the ALJ's determination that he did not meet a listing. Third, Claimant challenges the ALJ's decision as not being supported by substantial evidence. Each argument is considered below, in turn.

### A. The "Five-Day Rule"

Under 20 CFR §§ 404.935, 416.1435, an ALJ may decline to consider evidence that is not submitted at least five business days before the claimant's administrative hearing, unless certain exceptions apply in which case the ALJ "will accept" the late-filed evidence. The exception which Claimant contends is applicable to his case states that the ALJ will accept evidence submitted after the deadline if the ALJ has not issued a decision and the evidence was not submitted before the deadline because "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [him] from informing [the SSA] about or submitting the evidence earlier." 20 C.F.R. §§ 404.935(b)(3), 416.1435(b)(3). The regulation provides non-exhaustive examples of unusual, unexpected, or unavoidable circumstances beyond the claimant's control such as serious illness, death of an immediate family member, accidental destruction of

important records, or, as most relevant in this matter, situations in which the claimant "actively and diligently sought evidence from a source and the evidence was not received or was received less than five business days prior to the hearing." *Id.*

In providing guidance regarding what is often termed the "Five-Day Rule," the SSA recognized "that there will be circumstances in which claimants cannot produce evidence at least five business days before the hearing." Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987, 90990, 2016 WL 7242991 (Dec. 16, 2016). Therefore, the SSA "included appropriate exceptions to the 5-day requirement to ensure fairness when a claimant or his or her representative actively and diligently seeks evidence but is unable to obtain it." *Id.* Regarding the listed exception concerning unexpected or unavoidable circumstances beyond the claimant's control, the SSA removed the phrase "through no fault of your own" in order "to ensure that our adjudicators interpret this exception consistent with [the SSA's] intent." *Id.* The SSA further explained that the words "actively" and "diligently" are intended to be interpreted using their ordinary English usage. *Id.* Therefore, the SSA advised that when "a claimant or representative shows that he or she made a good faith effort to timely request, obtain, and submit evidence, but he or she did not receive the evidence in time to submit it at least 5 business days before the hearing because of circumstances outside his or her control, we expect that our adjudicators would find that this standard is met." *Id.*

In this matter, the ALJ refused to accept October 20, 2015 and May 2, 2017 medical opinions from Claimant's treating physician, Dr. McClung, because they were submitted on May 3, 2017 and May 4, 2017, two days and one day prior to the administrative hearing, respectively. (Tr. at 21, 55, 104). At the beginning of the hearing, the ALJ stated that he

was unlikely to include the opinions in the record because they were received within the five-day period, and there did not appear to be good cause for failure to file them by the deadline. (Tr. at 37-39). In his decision, the ALJ reiterated that the evidence was not considered given that Claimant had not met the requirements of 20 C.F.R. §§ 404.935(b), 416.1435(b). (Tr. at 21).

Claimant argues that he clearly established the late-submittal was due to unusual, unexpected, or unavoidable circumstance beyond his control such that the ALJ should have admitted the opinion into the record under 20 C.F.R. §§ 404.935(b), 416.1435(b). (ECF No. 7 at 11). Claimant points to counsel's representations at the hearing that he had experienced "great difficulty in obtaining not only the Medical Opinion, but the treatment record as well" from Dr. McClung as Dr McClung had suffered from health issues and had fallen behind on his review of records for release. (*Id.* at 9).

The Commissioner refutes Claimant's position, asserting that Claimant has not demonstrated that his late submission of evidence meets any of the exceptions provided by SSA regulation. (ECF No. 11 at 10). The Commissioner notes that one of the late-submitted opinions is dated October 20, 2015, more than a year and a half before the administrative hearing. Considering that Claimant was able to obtain and submit other records from Dr. McClung created around that time frame and subsequent to October 2015, in the Commissioner's view, Claimant's argument that he was unable to timely obtain the 2015 Medical Opinion is unpersuasive. (*Id.* at 11). The Commissioner cites to several cases in support of her argument. (*Id.*).

Although most of the cases cited by the Commissioner relate to evidence tendered after the administrative hearing, a district court case from Maine is perhaps the most analogous to the present case. In *Freeman v. Colvin*, No. 2:14-CV-412-JHR, 2015 WL

4041733, at *2 (D. Me. July 1, 2015), the district court similarly considered an ALJ's refusal to admit evidence that was submitted one day prior to the hearing. The claimant's attorney explained that the attorney's office had difficulty obtaining the record and that the evidence was received the day before the hearing and submitted to the ALJ the same day. *Id.* The ALJ refused to admit the evidence on the basis that the requirements of the regulation in effect at the time of the decision, 20 C.F.R. § 405.331(b), were not met. *Id.* Like the present case, the claimant argued that circumstances beyond his control prevented him from submitting the evidence earlier. *Id.* He noted that his counsel requested the record and repeatedly followed up, but that his treating providers did not produce the records until the day before the hearing. *Id.* at *2-3. Nevertheless, the court concluded that the claimant did not demonstrate that the ALJ's decision to reject the records was erroneous. *Id.* at *3. The court emphasized that an ALJ is not obligated to accept late-tendered evidence unless the claimant shows good cause for not filing it more than five days in advance of the hearing. *Id.* The court cited that the claimant did not "explain, let alone supply evidence corroborating, when he became aware of the missing records, why he only then became aware of them, how soon afterward he requested them, and what efforts he thereafter made to secure them in a timely fashion." *Id.* The court stated that such "details are material to [the] assessment of whether the standard is met." *Id.*

Other district courts have similarly been reluctant to overrule an ALJ's decision to exclude late-submitted evidence when the claimant argues tardy responses from medical professionals are to blame for the late submittal. *See Jones v. Berryhill*, No. CV 16-11011-DJC, 2017 WL 3726018, at *11 (D. Mass. Aug. 29, 2017) (upholding ALJ's decision to exclude evidence attorney argued was submitted late due to dilatory response from

medical records custodian as he had "plenty of time to obtain and submit the evidence in question"); *see also Marino v. U.S. Soc. Sec. Admin.*, No. 17-CV-179-JL, 2018 WL 4489291, at *3-4 (D.N.H. Sept. 19, 2018) (delay attributed to treating physician was not beyond claimant's control when claimant did not demonstrate sufficient diligence in pursuing the records); *Melissa D. v. Berryhill*, No. CV 17-0469-WES, 2018 WL 4405620, at *6 (D.R.I. Sept. 17, 2018), *report and recommendation adopted,* 2018 WL 4915826 (D.R.I. Oct. 10, 2018) ("The ALJ reasonably found the late submission was due to a delay in requesting the records and a delay in follow-up when the records were not forthcoming."); *Scates v. Comm'r of Soc. Sec.,* No. 1:12-CV-00408, 2014 WL 1092081, at *5 (E.D. Tenn. Mar. 17, 2014) (upholding Commissioner's decision to reject new evidence before Appeals Council where there was no evidence corroborating representation by claimant's counsel that he had timely told the ALJ about difficulties in obtaining medical records).

However, the undersigned recognizes that other courts have concluded that it can be an abuse of discretion to apply the Five-Day Rule to certain factual scenarios. In *Howe v. Colvin*, 147 F. Supp. 3d 5, 6 (D.R.I. 2015), the district court considered an ALJ's rejection of a lumbar spine RFC questionnaire prepared by the claimant's neurosurgeon, which stated that the claimant could perform less than sedentary work. The evidence at issue was submitted four days prior to the hearing due to an admitted error by the claimant's attorney, who explained that the record was stuck to another document in the attorney's file and was inadvertently not sent with the evidence in advance of the hearing. *Id.* The ALJ refused to admit the evidence and granted the claimant benefits through October 2011, but concluded that the claimant's condition was improved after that time. *Id.* at 7. In examining the ALJ decision, the court found it critical that the evidence was

24

directly probative of the disability decision because it was dated in October 2011 and very significantly conflicted with the ALJ's decision that the Claimant's back condition improved in October 2011 to the degree that she could perform sedentary work. *Id.* at 7-8. Ultimately, the court concluded that under those circumstances, the late submission of the evidence was a result of "an innocent clerical error" that was an "unusual or unexpected circumstance" beyond the claimant's control as contemplated in the regulation. *Id.* at 8. Thus, the court stated that "taking into account all of the relevant circumstances surrounding the party's late submission, and applying equitable principles to the situation, it [was] clear that the ALJ abused her discretion in not accepting and considering the late-submitted record." *Id.*

This Court has recently addressed the Five-Day Rule in a somewhat analogous case. *See Midkiff v. Berryhill,* No. 2:18-CV-00338, 2019 WL 1258845 (S.D.W. Va. Mar. 19, 2019). There, the claimant submitted a medical opinion one day before the hearing, but argued that it was subject to an exception as the opinion did not exist until two days prior to the hearing and thus could not possibly have been submitted earlier. *Id.* at *2. This Court found that argument unavailing and explained that it was "the [c]laimant's responsibility to provide the evidence on time or demonstrate an exceptional reason why the [c]laimant failed to get it timely, including whether he actively and diligently sought the late-filed evidence." *Id.*

In this case, one of Claimant's late-submitted opinions was created three days before the hearing, while the other was created nearly two years before the hearing. (Tr. at 55, 104). Unlike in *Midkiff,* Claimant's counsel here provides some explanation for his tardy submittals, asserting that Dr. McClung's office had only revealed to him the day before the hearing that Dr. McClung was behind on reviewing his medical records due to

"some heart problems." (Tr. at 38). Claimant's counsel stated that he "continued to persist and pursue and ask and beg and plead" for the medical records, but had only received them the day before the hearing. (*Id.*). The ALJ advised counsel that he was "not sure it still meets the criteria [of an exception]," and noted that the hearing had been scheduled 75 days in advance which should have alerted counsel that the records would need to be submitted in a timely fashion. (Tr. at 38-39).

The ALJ did not abuse his discretion in declining to admit the late-submitted documents. Claimant was provided with a Notice of Hearing on February 15, 2017, over 75 days before the hearing scheduled on May 5, 2017. (Tr. at 72). The Notice of Hearing informed Claimant that he may request a change in time or place of the hearing up to five days before the hearing with good cause. (Tr. at 73-74). On March 24, 2017, Claimant was sent a reminder by the SSA informing him specifically that he "must send us *or let us know about* all evidence at least five business days before your hearing." (Tr. at 68) (emphasis added). The letter indicated that the evidence may still be considered if "[s]ome other unusual, unexpected, or unavoidable circumstance beyond your control prevented you *from informing us about* or submitting the information earlier." (*Id.*). (emphasis added). The letter warned Claimant that the "ALJ will not consider the evidence if we do not find you meet one of these conditions for why you did not send us *or let us know about* the evidence earlier." (*Id.*). (emphasis added).

Thus, Claimant was specifically informed, in three separate statements, that he had an obligation to either submit, or inform the SSA about, evidence at least five days prior to his hearing. Claimant's counsel represented him during the disability application process since at least May 22, 2014. (Tr. at 153). On October 20, 2015, Dr. McClung signed medical records indicating that he had completed an "Ability to do work-related activities

form" at the request of "Gregory Prudich, Esq." (Tr. at 480). Accordingly, counsel must have been aware of the existence of the first Medical Opinion well before the deadline for submitting evidence.

This Court has already determined that an opinion dated within five-days of the hearing does not presumptively establish good cause, absent an "exceptional reason" why the claimant was unable to obtain the records earlier by actively and diligently seeking them. *See Midkiff,* No. 2:18-CV-00338, 2019 WL 1258845, at *2. The ALJ's determination that Claimant did not establish an exception to the Five-Day Rule, in regard to either opinion, was not a clear abuse of the ALJ's discretion, nor is it apparent that the ALJ employed the Five-Day Rule in an excessively rigorous manner. As described in the cases above, claimants' assertions that delay is due entirely to belated responses by medical record custodians generally have not been accepted by other district courts as establishing good cause for late submittals of evidence. As the Commissioner emphasizes, Claimant was able to obtain medical records from Dr. McClung's office for dates that included the first medical opinion. (Tr. at 499). This undermines counsel's assertion that the office was entirely unresponsive to his requests and raises the inference that more diligent pursuit of the records, including the Medical Opinions, would have yielded access in a more timely manner. Furthermore, counsel did not provide any letters, phone-logs, or other evidence corroborating his assertion that he had diligently requested and re-requested the records to no avail.

Even assuming that counsel's description of a backlog at Dr. McClung's office provides an excuse for the untimely submittal of the second Medical Opinion, it does not explain why counsel failed to inform the ALJ about both opinions and counsel's ongoing efforts to obtain them before they were late. Counsel was explicitly informed that he had

a duty to either submit the evidence, *or inform the ALJ of its existence*, five days prior to the hearing. (Tr. at 68). Claimant had over 70 days to obtain the records in question. (Tr. at 72). If, as counsel stated, he received no communication from Dr. McClung's office regarding the state of his requests for records until the day before the hearing, he had an obligation to inform the ALJ about those records prior to the deadline, and to explain his difficulties in collecting them. *See Shuey v. Berryhill*, No. 1:18-CV-00626, 2019 WL 1303201, at *5 (M.D. Pa. Feb. 28, 2019), *report and recommendation adopted*, No. 1:18-CV-626, 2019 WL 1299272 (M.D. Pa. Mar. 21, 2019) ("Moreover, while the delay in receiving the RFC assessment from Dr. Bennett might explain counsel's delay in supplying the opinion to the ALJ, it does not explain counsel's failure to inform the ALJ about the opinion earlier."); *See also Marino*, No. 17-CV-179-JL, 2018 WL 4489291, at *4 ("There is also no record that [the claimant] made any attempt to inform the ALJ ... that she was still seeking to gather additional written evidence.").

Accordingly, the undersigned **FINDS** that the ALJ did not abuse the discretion afforded to him by the Five-Day Rule in declining to admit opinions either known to Claimant before the deadline, or created after the deadline, where Claimant made no effort to inform the ALJ about the opinions or his attempts to obtain them.

### B. Decision that Claimant Does not Meet a Listing

Claimant argues that the Commissioner erred in finding that he did not meet listing 1.04A, disorders of the spine. (ECF No. 7 at 6). Claimant notes that he consistently reported back pain and difficulty walking to his treating physician during the relevant time period. (*Id.*). Claimant believes that the objective medical evidence, as revealed by several medical examinations, establishes nerve root compromise as required by listing 1.04. (*Id.* at 7). Claimant argues that he additionally meets the requirements contained in

28

subpart A, of the listing as the treatment records from Claimant's physician consistently "provide evidence of each and every necessary finding." (*Id.*). The Commissioner contends that in order to qualify for the listing, Claimant must establish that he meets *all* of the requirements contained in the listing, which he failed to do. (ECF No. 11 at 7-8).

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

At issue in this case is listing 1.04, disorders of the spine. Listing 1.04A states its requirements as follows:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by [1] neuroanatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss and, if there is involvement of the lower back, [4] positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. pt. 404, subpt. P, app. 1, 1.04A.

The Fourth Circuit has held that in order to meet the criteria of listing 1.04A, a claimant need not show that all the criteria were simultaneously present, rather, adjudicators should engage in "a more free-form, contextual inquiry that makes 12 months the relevant metric for assessment of the claimant's duration of disability." *Radford v. Colvin*, 734 F.3d 288, 293 (4th Cir. 2013). Listing 1.04A thus requires that a claimant show only "that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. In response to *Radford*, the SSA issued Acquiescence Ruling 15-1(4), which is applicable to states in the Fourth Circuit. Acq. Ruling 15-1(4), 80 Fed. Reg. 57418-02, 2015 WL 5564523 (SSA 23 Sept. 2015). Acquiescence Ruling 15-1(4) sets forth a two-step test for application of Listing 1.04A:

> Adjudicators will decide whether the evidence shows that all of the medical criteria in paragraph A are present within a continuous 12-month period (or, if there is less than 12 months of evidence in the record, that all the medical criteria are present and are expected to continue to be present). If all of the medical criteria are not present within a continuous 12-month period, adjudicators will determine that the disorder of the spine did not meet the listing.

> If all of the medical criteria in paragraph A are present within a continuous 12-month period (or are expected to be present), adjudicators will then determine whether the evidence shows—as a whole—that the claimant's disorder of the spine caused, or is expected to cause, nerve root compression continuously for at least 12 months. In considering the severity of the nerve root compression, the medical criteria in paragraph A need not all be present simultaneously, nor in particularly close proximity. The nerve root compression must be severe enough, however, that the adjudicator can fairly conclude that it is still characterized by all of the medical criteria in paragraph A.

Acq. Ruling 15-1(4), 80 Fed. Reg. at 57420, 2015 WL 5564523.

In analyzing whether Claimant met the listing at step three, the ALJ observed, Claimant had not displayed "a consistently positive straight leg-raising test." (Tr. at 26). Claimant initially displayed positive straight-leg raising tests, but ceased displaying positive straight-leg raising tests beginning in October 2014. (Tr. at 395). As the Commissioner points out, Claimant did not again display positive straight-leg raising tests during the duration of his treatment with Dr. McClung. (Tr. 395, 452, 459, 463, 467, 502, 506, 510, 514, 518, 522, 526, 530, 534, 538, 542, 546). Listing 1.04A requires a claimant to show "that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. However, "[a] claimant need not show that each symptom was present at precisely the same time—i.e., simultaneously—in order to establish the chronic nature of [her] condition." *Id.*

Here, the ALJ merely stated that Claimant did not have "a consistently positive straight leg-raising test" and did not elaborate further. (Tr. at 26). There is some ambiguity in the ALJ's use of the term "consistently" here. If the ALJ was under the impression that it was necessary to demonstrate positive straight-leg raising for a continuous 12-month period, rather than it merely being present in conjunction with the other symptoms during a continuous 12-month period where Claimant suffered from nerve root compression, this would run afoul of *Radford's* admonition that all the relevant symptoms need not be present simultaneously or necessarily in close proximity. *See Winders v. Berryhill*, No. 5:17-CV-598-D, 2019 WL 758614, at *5 (E.D.N.C. Feb. 1, 2019), *report and recommendation* adopted, No. 5:17-CV-598-D, 2019 WL 722566 (E.D.N.C. Feb. 19, 2019)(remanding where the court was "unable to determine whether [the ALJ] applied Listing 1.04 in a manner that required evidence demonstrating the presence of all

31

paragraph A criteria for a continuous twelve-month period contrary to *Radford*.").

If, however, the ALJ was referring to the fact that Claimant's positive leg-raising permanently resolved itself within 12 months of the alleged onset date, then this would not run afoul of the holding in *Radford*. *See Robinson v. Berryhill,* No. 1:16CV408, 2017 WL 3396513, at *5 (M.D.N.C. Aug. 7, 2017) ("Here, unlike *Radford*, the ALJ did not require [the claimant] to show simultaneous presentation of Listing 1.04A; rather, he found that [the claimant] no longer suffered from the Listing criteria for a period of 12 months within the alleged onset date."); *see also Pass v. Colvin*, No. CV 0:15–208–TLW–PJG, 2015 WL 9991455, at *15 (D.S.C. Nov. 24, 2015), *report and recommendation adopted*, No. 0:15–CV–208–TLW, 2016 WL 403865 (D.S.C. Feb. 3, 2016) (unpublished) ("Unlike *Radford*, the ALJ in this case found that [the claimant's] condition had resolved, not simply that his symptoms were not simultaneously present."). Claimant's alleged onset date was December 23, 2013. Physical examinations revealed that he stopped suffering from straight-leg raising in October 2014, and received no subsequent positive results for the duration of his alleged period of disability. Therefore, the ALJ could appropriately have found that Claimant did not meet the listing as a listing criterion had become permanently resolved within 12 months after the alleged onset date.

Even assuming the terse nature of the ALJ's analysis at step three did not comport with the requirements of *Radford*, this Court has held that "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Johnson v. Berryhill*, No. 2:17-CV-01608, 2018 WL 1096463, at *11 (S.D.W. Va. Feb. 1, 2018), *report and recommendation adopted*, No. 2:17-CV-01608, 2018 WL 1095581 (S.D.W. Va. Feb. 28, 2018) (internal quotation omitted). Moreover, an

"ALJ is only required to explicitly identify and discuss relevant listings of impairments where there is 'ample evidence in the record to support a determination' that an impairment meets or medically equals a listing." *Kelly v. Astrue*, No. 5:08-CV-289-FL, 2009 WL 1346241, at *5 (E.D.N.C. May 12, 2009) (internal quotation omitted). Thus, courts in the Fourth Circuit have generally found that even if an ALJ's listing analysis alone may not survive judicial scrutiny, if, elsewhere in the opinion, the ALJ makes clear that the claimant does not meet the listing, the opinion should be upheld. *See McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) ("if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination.") (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011)); *See also McAuley v. Colvin*, No. 7:12-CV-311-D, 2013 WL 7098724, at *9 (E.D.N.C. Dec. 13, 2013) ("Nonetheless, the evidentiary basis for the ALJ's conclusion that Listing 1.04 was not met is evident from the record, and from the ALJ's RFC determination."); *Buchanan v. Astrue*, No. 4:10–cv–167–FL, 2011 WL 5439087, at *5 (E.D.N.C. Aug. 15, 2011) (substantial evidence in record to support step three determination where testing did not reveal sensory or reflex loss); *Painter v. Berryhill*, No. 5:17-CV-02610-JMC, 2019 WL 1292459, at *3 (D.S.C. Mar. 21, 2019) ("although the ALJ concluded that [the claimant] did not meet listing 1.04 in a somewhat perfunctory manner at step three ... a review of the decision as a whole shows that [the ALJ] thoroughly considered and cited the evidence of record that supported his conclusion.") (internal quotations omitted).

Listing 1.04A requires "[e]vidence of nerve root compression." 20 C.F.R. pt. 404, subpt. P, app. 1, 1.04A. This compression must additionally be "characterized by" four distinct requirements. *Id.* Irrespective of these four requirements, one of the few objective

medical tests contained in the record directly refutes Claimant's contention that he has provided evidence of nerve root compression. The MRI examination taken on January 6, 2014 specifically found that, while there was evidence of "broad-based disc protrusion," this protrusion appeared to only "abut or mildly displace *but not compress* the exiting nerve root at that level." (Tr. at 389) (emphasis added). One of the other objective medical tests, the EMG study conducted in September 2016, likewise did not provide evidence of nerve compression. That test revealed only "evidence of mild tibial motor neuropathy in the right lower limb," with the results "otherwise normal," showing "no electrodiagnostic evidence of lumbar radiculopathy or lumbosacral plexopathy in [the] right lower limb." (Tr. at 485). The ALJ explicitly referred to these findings in determining that Claimant's impairments were not as limiting as he alleged. (Tr. at 27).

The ALJ noted that despite Claimant's "limited treatment protocol, e.g. no injections or surgery, mild MRI and EMG findings," Claimant retained the ability to "care for his personal needs, cook, clean, work on his car, fish, drive, shop, spend time with friends and family, do light gardening, and manage his monthly public assistance benefits." (Tr. at 27-28). The ALJ additionally indicated that he placed "great weight" on the reviewing opinions of the doctors at the initial and reconsideration stages of review who found Claimant non-disabled. (Tr. at 28).

As Claimant was attempting to establish he met a listing, he bore the burden of production and proof in establishing that he met the requirements. *Schweiker*, 699 F.2d at 191. However, Claimant provided no medical records indicating he suffered from nerve compression. To the contrary, as stated, one of the few objective tests he provided negated the presence of nerve root compression. (Tr. at 389). Additionally, as noted above, Claimant's medical record showed that he permanently stopped displaying positive

34

straight-leg raising results within 12 months of his alleged disability onset date. Accordingly, the ALJ's discussion of this evidence in assessing Claimant's RFC and determining that Claimant's limitations were not as severe as alleged makes sufficiently clear the reasons for the ALJ's determination that Claimant did not meet or medically equal Listing 1.04A. *See Boone v. Colvin*, No. CV ADC-15-2896, 2016 WL 6462185, at *8 (D. Md. Oct. 31, 2016) (finding that "in light of the lack of evidence in the medical record related to nerve root compression," the ALJ's discussion of the relevant medical evidence revealed substantial evidence to determine the claimant did not meet listing 1.04A).

Accordingly, the undersigned thus **FINDS** that the ALJ's determination that Claimant did not meet the requirements of listing 1.04A was supported by substantial evidence.

### C. Decision is Not Supported by Substantial Evidence

Claimant characterizes his objections to the decision as raising two distinct claims: (1) that the Commissioner did not provide a rationale for the determination that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible, and (2) that the Commissioner erred in weighing the Claimant's credibility as to his statements regarding the intensity, persistence, and limiting effects of his symptoms. (ECF No. 7 at 13, 19). Claimant contends that the ALJ's use of "boilerplate language" and scant analysis of the record fails to articulate how Claimant's credibility was undermined in light of the objective medical evidence. (*Id.* at 21). These two claims raise essentially the same argument: that the ALJ did not effectively analyze the available evidence regarding Claimant's subjective symptoms, and that, consequently, his decision was not supported by substantial evidence. Therefore, the undersigned will consider the claims together.

Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable physical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which

36

is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) A longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical

evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*

*v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ clearly performed the two-step process. The ALJ noted Claimant's pain complaints related to his "longstanding history of low back issues." (Tr. at 27). Ultimately, after considering the subjective and objective evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*).

In considering the medical evidence, the ALJ noted that Claimant "has exhibited tenderness, range of motion deficits, a slightly limping gait, hyperesthesia along the L4 dermatome, weakness with dorsiflexion of the right foot, and episodic positive straight leg raising." (*Id.*). The ALJ stated that these impairments "appear[] rather significant at first blush." (*Id.*). The ALJ went on to note, however, that Claimant's "lumbar MRI only documented degenerative changes with a broad based disc protrusion toward the right at L5-Sl, appearing to abut or mildly displace, but not compress the exiting nerve root, and his EMG only revealed 'mild' tibial motor neuropathy on the right lower limb." (*Id.*). Moreover, Claimant's "symptoms improved with only conservative care" as "[b]y late 2015, he was no longer exhibiting evidence of hyperesthesia or positive straight leg raising." (Tr. at 27).

Considering Claimant's "tenderness, range of motion deficits, weakness with dorsiflexion, episodic neurological issues, and obese body habitus," the ALJ determined that Claimant was unable to perform the full range of light work. (*Id.*). However, given that Claimant retained the ability to "care for his personal needs, cook, clean, work on his

car, fish, drive, shop, spend time with friends and family, do light gardening, and manage his monthly public assistance benefits," despite "limited treatment protocol, e.g. no injections or surgery, mild MRI and EMG findings," the ALJ determined Claimant did not require greater limitations. (Tr. at 27-28). The ALJ stated he "afford[ed] great weight" to the opinions of the state agency physicians, and believed that their assignment of Claimant to the light exertional level "properly balance[d] the claimant's positive objective findings with his lack of aggressive treatment and retained abilities." (Tr. at 28).

Claimant argues that the opinion is "devoid of any true analysis of the factors required to assess credibility" and attacks the basis of the ALJ's analysis through several distinct arguments. (ECF No. 7 at 20). These will be considered in turn.

### 1. The ALJ's use of Claimant's daily activities reports

Claimant faults the ALJ for relying on Claimant's reported daily activities to discredit Claimant's statements regarding the intensity of his limitations. (*Id.* at 17). Claimant asserts that the ALJ "simply recites a litany of general activities" while failing to "consider[] the detail provided by" Claimant's testimony at the hearing. (*Id.*). Claimant contends that his testimony revealed that he encountered significant difficulties in completing those activities, and the ALJ's consideration of those activities, which contains "no analysis of the actual functioning," omits these difficulties and does not represent an accurate depiction of Claimant's limitations. (*Id.*).

In his Adult Function Report, completed in October 2014, Claimant stated that he "really enjoy[ed] being outdoors" and that his hobbies included working on vehicles, hunting, fishing, and hiking. (Tr. at 253). Claimant indicated that he partook in these activities once a week. (*Id.*). When asked how his impairments had changed his ability to enjoy these activities, Claimant said only that he was no longer able to "climb," or go up

40

or down rugged terrain. (*Id.*). At the hearing, Claimant confirmed that he was able to work on his vehicles. However, Claimant added he was unable to "stoop in over or under a hood anymore for any length or period of time," and was additionally unable to do any "heavy lifting or pulling or tugging on stuff." (Tr. at 44). Claimant further relayed that tasks, such as an oil change, took him significantly longer than it would have prior to the injury. (*Id.*). When the ALJ asked Claimant if he still went hunting and fishing, Claimant replied "Yes. I love to hunt and fish." (Tr. at 43). Claimant further stated that he did not go out "so much," but had been out one time during trout season and had "caught a couple." (*Id.*). Claimant additionally told the ALJ that he would "fool with a garden," although he was limited in his ability to do so by his impairment. (*Id.*).

The ALJ did not act inappropriately when he considered the fact that Claimant's self-reports and testimony revealed he was capable of working on vehicles and taking hunting and fishing trips in fashioning an RFC that limited Claimant to light exertional work. Claimant cites to a Seventh Circuit case in support of his argument that there is a "critical distinction" between activities an individual is able to do at home, in their own free time, "and performing required duties in the workplace on a schedule." (ECF No. 7 at 18). In, *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), the Seventh Circuit stated that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons ... and is not held to a minimum standard of performance, as she would be by an employer." 671 F.3d at 647. The Fourth Circuit has likewise faulted an ALJ's reliance on reported daily activities to refute a Claimant's described symptoms when he "did not acknowledge the limited extent of those activities as described by [the claimant] or explain how those activities showed that [she] could sustain a full-time job."

41

*Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017).

The ALJ here, by contrast, did not conflate the concept of recreational activities with employment duties, or uncritically assume that Claimant would be capable of performing at that same level of exertion throughout an eight-hour workday. The ALJ did not take Claimant's ability to recreationally hunt, fish, hike, and perform automotive repairs to mean that he could return to his job as an automobile technician or would be capable of finding employment as a game warden. The ALJ simply assessed these daily activities as evidence that Claimant would not be entirely precluded from finding employment and would be capable of performing work at a reduced light exertional level. Claimant's testimony and self-reports established that he was able to partake in a broad array of activities involving some physical exertion. It was not inappropriate for the ALJ to consider these reports, among other evidence, in determining that Claimant's symptoms were not as debilitating as his subjective complaints indicated. *See Mastro v. Apfel*, 270 F.3d 171, 179 (4th Cir. 2001) ("We find that the ALJ correctly applied the law in concluding that [the claimant's] reported daily activities undermined her subjective complaints of chronic fatigue."); *see also Rexrode v. Astrue*, No. 2:09-CV-00153, 2010 WL 1253733, at *15 (S.D.W. Va. Mar. 29, 2010) (ALJ appropriately took into account claimant's "broad range of self-reported daily activities" in finding her subjective limitations not entirely credible).

The undersigned therefore **FINDS** that the ALJ did not improperly rely on Claimant's reported daily activities in making his decision.

### 2. ALJ erred in relying on Claimant's limited treatment protocol

Claimant contends that the ALJ erroneously determined "that because [Claimant] underwent limited treatment protocol, whatever that means, that his condition cannot be

42

disabling." (ECF No. 7 at 16). Claimant points out that there may simply have been no surgical, or other aggressive treatment options available to him, and argues that the fact Claimant received only conservative care is "insufficient in and of itself to reject the nature and severity of [Claimant's] pain complaints and functional limitations." (*Id.*).

An ALJ may consider a claimant's course of treatment in assessing whether the claimant's statements about her pain are credible. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Courts in this Circuit have accordingly upheld decisions by ALJs that rely, at least partially, on the limited and conservative nature of a claimant's treatment. This Court has previously affirmed a decision where the ALJ denied the claimant's application in part because he found "[if] the claimant were suffering to the extent alleged it would be expected that intensification of treatment would occur. However, the claimant has continued on with conservative treatment." *See Taylor v. Astrue*, No. 2:10-CV-0881, 2011 WL 4435546, at *17 (S.D.W. Va. Sept. 22, 2011); *see also Sharp v. Colvin*, 660 F. App'x 251, 259 (4th Cir. 2016) ("The ALJ was permitted to make this determination that [the claimant's] treatment was conservative, and that her course of treatment supported a conclusion that she was able to maintain a routine work schedule."); *Weaver v. Colvin*, No. 3:15-CV-00026, 2016 WL 4768841, at *9 (W.D. Va. Sept. 13, 2016) ("But the nature of that treatment and the partial pain relief afforded by conservative measures provide grounds for the ALJ to question the severity of [the claimant's] symptoms."); *Nichols v. Colvin*, 100 F. Supp. 3d 487, 509 (E.D. Va. 2015) ("Moreover, the ALJ did specifically cite [the claimant's] conservative treatment history and his extensive daily activities as evidence that rendered [the claimant's] subjective complaints 'less than fully credible.'"); *Harris v. Colvin*, No. 7:13CV00024, 2014 WL 4749110, at *4 (W.D. Va. Sept. 23, 2014) ("Both the magistrate judge and the ALJ correctly point to [the claimant's] conservative

treatment history, ... as reason to discount [the claimant's] testimony as to the severity of her limitations."); *Dingess v. Colvin*, No. CIV.A. 3:13-12562, 2014 WL 3512847, at *11 (S.D.W. Va. July 14, 2014) (upholding ALJ's decision where he found the claimant's subjective symptoms were "'inconsistent with the overall medical record that finds minimal, conservative treatment.'"). However, as "[m]any potentially disabling conditions can be treated by routine and conservative treatment," courts have recognized that the characterization of treatment as conservative "alone does not provide any insight into the severity of a given condition and may even belie the condition's seriousness." *Viverette v. Astrue*, No. 5:07-cv-395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). Accordingly, while it may be appropriate to consider the conservative nature of a treatment record, a claimant should not "be faulted 'for failing to pursue non-conservative treatment options where none exist.'" *Johnson v. Colvin*, No. 3:14-CV-00046, 2016 WL 1090667, at *13 (W.D. Va. Mar. 18, 2016) (quoting *Lapierre-Gutt v. Astrue*, 382 Fed.Appx. 662, 664 (9th Cir. 2010)).

The ALJ noted that Claimant's "symptoms improved with only conservative care" and determined that this improvement, despite a "lack of aggressive treatment," as well as Claimant's retained abilities, suggested that he had the RFC to perform less than a full range of light level work. (Tr. at 27-28). Claimant's care was conservative, largely consisting of monthly check-ins, pain medication, and physical therapy. *See Gregory v. Colvin*, No. 4:15-CV-5, 2016 WL 3072202, at *3 (W.D. Va. May 6, 2016), *report and recommendation adopted*, No. 4:15-CV-00005, 2016 WL 3077935 (W.D. Va. May 31, 2016) "[The claimant's] course of treatment was conservative, consisting of injections, physical therapy, and pain medication."); *see also Gilliam v. Berryhill*, No. 2:17-CV-00603, 2017 WL 3634097, at *9 (S.D.W. Va. July 25, 2017), *report and recommendation*

44

*adopted*, No. CV 2:17-0603, 2017 WL 3633281 (S.D.W. Va. Aug. 23, 2017) ("trial spinal cord stimulator placement was not a traditional conservative treatment method, as opposed to pain medications and physical therapy."). Dr. McClung's records reflect a report by Claimant that he was seen by a neurosurgeon to evaluate his back issues and was told by the neurosurgeon that his back pain had a "non-surgical" cause and "that eventually it would improve some." (Tr. at 426).

The ALJ did not erroneously rely on the conservative nature of Claimant's treatment in assessing the validity of Claimant's subjective symptoms. The ALJ did not fault Claimant for failing to pursue aggressive treatment methods, or suggest that it indicated Claimant's professed pain symptoms were not genuine. Rather, the ALJ discussed Claimant's "limited treatment protocol" to note that Claimant's condition displayed improvement despite receiving only conservative care. (Tr. at 27).

Moreover, the ALJ did not err in considering that Claimant's condition improved with only conservative care. *See, e.g., Gill v. Astrue*, No. 3:11CV85-HEH, 2012 WL 3600304, at *10 (E.D. Va. Apr. 4, 2012), *report and recommendation adopted*, No. 3:11CV85-HEH, 2012 WL 3600308 (E.D. Va. Aug. 21, 2012) (ALJ appropriately noted that Claimant displayed improvement despite conservative treatment plan). Beginning in October 2014, the clinical records prepared by Dr. McClung established that Claimant no longer had positive straight leg raises. (Tr. at 395). The continued absence of positive findings on straight leg raise over the following year indicated that the condition causing the prior findings had resolved with the passage of time, just as the neurosurgeon suspected would occur when he examined Claimant. Also in October 2014, Claimant began displaying improving girth in his right leg muscle as compared to his left leg, although this improvement did fluctuate over time. (Tr. at 395, 514, 518). In the December

45

2015, and January 2016 reports, Dr. McClung no longer indicated that Claimant was exhibiting a positive abnormal foot slap with heel strike when attempting to walk. (Tr. at 502, 506). These improvements in Claimant's condition were significant to the determination of whether his impairment would last twelve months or more.

Therefore, the undersigned **FINDS** that this use of Claimant's treatment record was not inappropriate and was supported by substantial evidence.

### 3. ALJ inappropriately made a medical determination

Claimant asserts that the ALJ erred when he analyzed Claimant's objective medical tests as he inappropriately determined that they revealed mild findings. (ECF No. 7 at 15). Claimant faults the ALJ for "without any medical expert's opinion," concluding "that the MRI study '*only*' documented degenerative changes … and the EMG study '*only*' revealed mild tibial motor neuropathy on the right lower limb." (*Id.* at 15-16) (emphasis original).

An ALJ is required to consider the objective medical evidence when assessing a claimant's disability claim. 20 C.F.R. §§ 404.1512(b), 404.1529(a), 416.912(b), 416.929(a). The Hearings, Appeals and Litigation Law Manual ("HALLEX") is a "manual in which the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals (OHA) staff." *Melvin v. Astrue*, 602 F.Supp.2d 694, 699 (E.D.N.C. 2009). According to HALLEX, an ALJ must obtain a medical expert's opinion "[t]o evaluate and interpret background medical test data." HALLEX I–2–5–34(B). An ALJ may obtain a medical expert's opinion in "determining the degree of severity of a claimant's physical or mental impairment." HALLEX I–2–5–34(A).

In this case, the ALJ characterized the January 2014 MRI, and the later EMG study, as revealing "mild" findings. (Tr. at 27). Claimant's January 2014 MRI was

interpreted by Robert O'Brien, M.D. (Tr. at 389). Dr. O'Brien's summary of the MRI study said that the examination revealed "relatively *mild* disc degenerative changes throughout the lumbar spine, greatest at L4-5" as well as "*mild* facet degenerative changes throughout the lumbar spine." (Tr. 388) (emphasis added). There was additionally, "*minimal* disc bulging at L3-4 with *minimal* encroachment upon the canal and left neural foramen." (*Id.*) (emphasis added). The reviewing physician believed that the disc bulging "does appear to abut or *mildly* displace but not compress the exiting nerve root at that level." (Tr. at 389) (emphasis added). Similarly, when interpreting Claimant's September 2016 EMG study, the reviewing physician, Alexis Tracy, D.O., concluded that there was "evidence of *mild* tibial motor neuropathy in the right lower limb." (Tr. at 485) (emphasis added). However, she reported that the study was "otherwise normal," and there was "no electrodiagnostic evidence of lumbar radiculopathy or lumbosacral plexopathy in [the] right lower limb." (*Id.*).

The ALJ, therefore, was not inappropriately evaluating medical test data when he characterized Claimant's medical tests as revealing relatively mild results. Instead, he was reporting the interpretations provided by the physicians administering the tests. The Fourth Circuit has considered this issue when a claimant argued that an ALJ erroneously determined that a medical test revealed mild findings without the benefit of a medical opinion. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (unpublished *per curiam*). The Fourth Circuit noted that "the nerve conduction test [the claimant] identifies as too technical for a layman to interpret was interpreted in functional terms by the examining physician." *Id.* at 230 n.2. The Fourth Circuit accordingly held that the ALJ was entitled to rely on the test's finding that the claimant only displayed mild carpal tunnel syndrome. *Id.* Lower courts in the Fourth Circuit have likewise held that when an

47

objective medical test is interpreted as revealing "mild" findings by a medical professional, the ALJ is entitled to rely on that characterization. *See Locklear v. Colvin,* No. 7:14-CV-53-FL, 2015 WL 860858, at *9 (E.D.N.C. Feb. 27, 2015); *see also Hollowel v. Colvin,* No. 4:14-CV-162-FL, 2015 WL 5725682, at *5 (E.D.N.C. Sept. 30, 2015); *Mabus v. Colvin*, No. 4:13-CV-3028-TER, 2015 WL 1400053, at *9 (D.S.C. Mar. 26, 2015).

The undersigned accordingly **FINDS** that the ALJ appropriately reviewed the objective medical tests, and his interpretation of their results as revealing generally mild findings is supported by substantial evidence.

### *4. Insufficient analysis of the medical record*

Finally, Claimant argues that the ALJ did not give appropriate consideration to the medical record. (ECF No. 7 at 21). Claimant does not specifically indicate what aspect of the medical record he believes the ALJ overlooked; instead, he cites to the record in bulk and asserts that the ALJ entirely failed to consider the relevant evidence establishing Claimant's limitations. (*Id.*). The medical record consists largely of treatment notes from Claimant's monthly, or occasionally bi-monthly, visits with Dr. McClung; records from Claimant's visit to the emergency room following his injury; and two objective medical tests examining Claimant's impairments. The ALJ adequately analyzed this evidence. The ALJ considered that Claimant's visits with Dr. McClung revealed a variety of fluctuating symptoms such as "tenderness, range of motion deficits, a slightly limping gait, hyperesthesia along the L4 dermatome, weakness with dorsiflexion of the right foot, and episodic positive straight leg raising." (Tr. at 27). The ALJ explicitly considered both objective medical tests, finding that they revealed Claimant suffered from impairments, but not to a debilitating degree. (*Id.*). The ALJ additionally relied on the opinions of the agency physicians. (Tr. at 28).

It is true, as Claimant points out, that the ALJ did not explicitly cover the emergency room records, or physical therapy records. (ECF No. 7 at 21). However, these exhibits revealed little substantive medical information that was not duplicated elsewhere in the record. The physical therapy records contained little information regarding Claimant's physical impairments that is not contained in his contemporaneous visits with Dr. McClung, other than noting that his rehabilitation potential was "good." (Tr. at 353, 355, 357, 359, 361, 363, 365, 367, 369, 371, 375). The emergency room records likewise do not reveal substantial substantive evidence regarding Claimant's condition that is not duplicated elsewhere in the record. Claimant did undergo several x-ray scans while at the emergency room; however, the reviewing physician opined that an MRI examination would reveal more accurate results. (Tr. at 381). An MRI examination was conducted on January 6, 2014, and the ALJ considered this study. (Tr. at 27).

An ALJ is required to consider all of the relevant medical evidence submitted by a claimant. *See* 20 C.F.R. § 416.920. This Court has recognized, however, that "the ALJ need not comment on every piece of evidence in the record." *Cook v. Colvin*, No. 2:13-CV-30155, 2015 WL 430880, at *17 (S.D.W. Va. Jan. 30, 2015). Furthermore, if the Commissioner has "stated that the whole record was considered, ... absent evidence to the contrary, we take her at her word." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Here, the ALJ stated that he had reached his decision "[a]fter careful consideration of the evidence," and indicated he understood his responsibility to review all the medical evidence. (Tr. at 27).

Claimant argues that the ALJ provided insufficient analysis of the medical record but fails to identify how, specifically, the evidence contradicts the determinations reached by the ALJ. *See Young v. Astrue*, No. 1:09CV1008, 2013 WL 474787, at *4 n.6 (M.D.N.C.

49

Feb. 7, 2013) (the claimant "points to no specific evidence of record that the ALJ failed to discuss that might have led the ALJ to formulate a more restrictive RFC, much less find her disabled.") *see also Miles v. Astrue*, No. C.A. 8:07-3164-RBH, 2009 WL 890651, at *14 (D.S.C. Mar. 30, 2009) (the claimant failed to specify how allegedly ignored evidence would affect the ALJ's decision). The ALJ discussed Claimant's impairments as established by the medical record. He stated that these appeared "rather significant at first blush," but went on to determine that, when weighed against other evidence in the record, Claimant was capable of performing light exertional work. (Tr. at 27-28). Claimant argues that the ALJ never explains his reasoning, based on the medical record, for discounting Claimant's subjective symptoms, "except as relates to the already discredited limited assessment of the diagnostic studies, the treatment history, and the activities of daily living." (ECF No. 7 at 20). However, as discussed above, Claimant does not successfully discredit the ALJ's use of this evidence.

By citing to essentially the entire medical record and stating that the ALJ's analysis was insufficient, Claimant is asking this Court to re-weigh the evidence and come to a conclusion contrary to that of the ALJ. (ECF No. 7 at 21). However, that is not the role that this Court plays in reviewing the ALJ's decision. *Hays*, 907 F.2d at 1456. The Court "must sustain the ALJ's decision, even if [it] disagree[s] with it, provided the determination is supported by substantial evidence." *Sims v. Colvin*, No. 0:14-1663-MGL-PJG, 2015 WL 5525096, at *4 (D.S.C. Sept. 17, 2015) (quoting *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996)).

The ALJ's decision is supported by substantial evidence. The ALJ recognized that Claimant's visits to Dr. McClung revealed a variety of limiting symptoms. (Tr. at 27). The ALJ additionally recognized that Claimant's objective medical tests revealed mild

limitations. (*Id.*). In determining that Claimant was not unable to perform any work in the national economy, the ALJ believed that the opinions of the state agency evaluators appropriately weighed these "positive objective findings" against Claimant's retained physical abilities, as demonstrated by his self-reports, and his improvement despite conservative care. (Tr. at 27-28). Accordingly, in addition to the medical evidence, the ALJ properly considered Claimant's statements, his daily activities, and the opinion evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms.

Therefore, taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed

Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 25, 2019

Cheryl A. Eifert
United States Magistrate Judge